UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| GREGORY V.,<br>        *Plaintiff*,<br><br>   v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>        *Defendant*. | Civil No. 1:20-CV-00124-LO-MSN |

## REPORT AND RECOMMENDATION

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 15, 21). Plaintiff Gregory V. ("plaintiff") seeks judicial review of the final decision of defendant Commissioner of the Social Security Administration, denying his claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423 (the "Act") and Supplemental Security Income under Title XVI. For the reasons stated below, the undersigned Magistrate Judge recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 15) be DENIED, defendant's Motion for Summary Judgment (Dkt. No. 21) be GRANTED, and the ALJ's decision be AFFIRMED.[1]

### I.      Background

Plaintiff applied for disability insurance benefits and Supplemental Security Income on June 13, 2016. AR at 18. Plaintiff alleged disability beginning October 1, 2015. Pl. Br. (Dkt. No. 16) at 1. Plaintiff claimed the following disabilities: gout, hypertension, a hernia, back pain, polycythemia (increased production of red blood cells), and diverticulitis. *Id.* at 1.

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Dkt. No. 12).  In accordance with those rules, this report and recommendation excludes any personal identifiers such as plaintiff's full name, social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

Plaintiff's application was initially denied on August 2, 2016, and again upon reconsideration on February 22, 2017. *Id.* A video hearing was held on September 21, 2018, before Administrative Law Judge ("ALJ") Mary Ann Poulose. *Id.* Plaintiff, represented by an attorney, testified at the hearing, as did a Vocational Expert ("VE"). AR at 18. On January 25, 2019, the ALJ issued a decision finding that plaintiff was not disabled under the Act from October 1, 2015 through the date of the order. *Id.* at 18-30. Plaintiff requested review of the decision by the Appeals Council and, on December 6, 2019, the Appeals Council denied the request, finding no basis for review. *Id.* at 3.

Having exhausted his administrative remedies, plaintiff filed a Complaint with this Court on February 5, 2020, challenging the ALJ's decision. (Dkt. No. 1). Plaintiff filed a Motion for Summary Judgment (Dkt. No. 15) on July 22, 2020, including a Memorandum in Support of Plaintiff's Motion for Summary Judgment (Dkt. No. 16). The Commissioner filed a Motion for Summary Judgment (Dkt. No. 21) on August 21, 2020, along with a Memorandum in Support of Defendant's Motion for Summary Judgment (Dkt. No. 22). Accordingly, the parties' motions are ripe for disposition.

## II.     Evidence before the ALJ

Below is a summary of plaintiff's testimony before the ALJ, medical evidence of plaintiff's physical impairments, and state agency opinion evidence.

### a.  Plaintiff's Testimony at the Administrative Hearing

At the hearing on September 12, 2018, plaintiff testified that he was 60 years old. AR at 41. His attorney proffered that plaintiff cannot do his prior work due to disc degeneration of the cervical spine, periodic chronic gout, polycythemia, inguinal hernia, peripheral artery disease of the right ankle, thoracic outlet compression of the left arm, weakness in the right arm, possible

chronic bronchitis, likely COPD, sleep apnea, chronic headaches, insomnia, right shoulder tendonitis with AC joint arthropathy, and lumbar degenerative disc disease. *Id.* at 41-42.

Plaintiff completed high school and lives with his wife. *Id.* at 42. He stated that he left his job as a residential specialist on January 1, 2016, where he worked with at-risk youth, transporting them, serving food, taking them to appointments and outings, and providing medication. *Id.* at 43. Prior to that, he worked for Riverside Treatment Services as a mental health technician performing similar tasks, including teaching classes. *Id.* at 44. In 2016, plaintiff left his job due to dizziness caused by polycythemia. *Id.* at 45.

Plaintiff testified that he had no trouble driving and that he drives daily. *Id.* at 46. In a typical day he takes his wife to work and goes to a park where he walks 15 minutes, rests, and then walks 15 minutes more. *Id.* at 47. He rests because his right leg hurts due to his peripheral arterial disease. *Id.* at 49. Following that, he takes a nap and cleans the house, vacuuming and cleaning the bathrooms. *Id.* He testified that he takes out the trash, occasionally does dishes, and does laundry with his wife's assistance. *Id.* at 47-48. He goes shopping with his wife and testified that, while he did not believe he could lift a case of water, he can lift a gallon of water. *Id.* at 50. He further replies that he can pick up a piece of paper off the ground, but has trouble gripping with his right hand, some trouble gripping doorknobs, and trouble with zippers and buttons due to his stroke. *Id.* Plaintiff stated that he has gout flare ups twice every four months, lasting three to four weeks each time. *Id.* at 54. He testified that his dizziness had ceased, but that he feels generally unstable. *Id.* at 55. He experiences swelling of the left ankle and pain of the right leg. *Id.* at 56. Plaintiff also testified that he has poor memory following the stroke. *Id.* at 60.

He treats his leg pain by icing, resting, and elevating at night only. *Id.* He uses a cane to help with his swollen ankle. *Id.* at 59. He wears a back brace to help with his lower back pain. *Id.*

at 58. Plaintiff testified that he had just completed occupational therapy and was beginning physical therapy following his stroke. *Id.* at 54. He stated that he takes medication for his stroke, right leg pain, gout, back muscle spasms, high blood pressure, and dizziness when he had polycythemia. *Id.* at 51-52. He also takes vitamin D3 and uses an inhaler twice daily. *Id.* at 58. He described aching joints resulting from his blood thinner. *Id.* at 57. He testified to pain in both arms when he takes medication, causing trouble reaching in front of him and overhead. *Id.* at 55. He further described headaches resulting from his medication. *Id.* at 60.

In testimony from the VE, it was established that plaintiff worked as a psychiatric aid, which covers plaintiff's former jobs as a residential specialist and mental health technician. *Id.* at 61. These jobs are classified as medium work. *Id.* at 62.  Plaintiff testified that the heaviest items he had to lift at his former jobs were groceries or food trays. *Id.* This was consistent with his former employment being performed as medium work. *Id.* at 63. The ALJ posed the following hypothetical for the VE to consider: the hypothetical person has plaintiff's same age, high school education, and past work as described; is limited to medium work with no exposure to hazards, no unprotected heights, no hazardous machinery, no commercial driving, no ladders, ropes, scaffolds, or foot controls, and no frequent climbing, crouching, crawling, stooping, kneeling. *Id.* at 63. The VE responded that the hypothetical person would be able to perform the past medium work. *Id.* However, the VE noted that, as performed, plaintiff drove at his prior jobs, although that is not a requirement per the *Dictionary of Occupational Titles,* and that would be a discrepancy. *Id.* The ALJ then asked if there would be other jobs in the region or national economy for unskilled work of the medium level, for a person with the same characteristics. *Id.* at 64. The VE responded affirmatively that this person could perform the following jobs: laundry laborer, floor waxer, or meat trimmer. *Id.*

Plaintiff's counsel asked the VE if an individual needing a sit-stand option every 30 minutes could perform medium work. *Id.* at 65. The VE responded that there would not be jobs at the medium level, but there would be positions at the light or sedentary level. *Id.* at 66. Counsel also asked whether a sit-stand break every hour would eliminate medium work. *Id.* The VE confirmed that it would rule out medium work, but would be consistent with light or sedentary work. *Id.* The VE noted that the *Dictionary of Occupational Titles* does not address off task work or sit-stand options and her responses were based on education and experience. *Id.*

### b.  Medical Evidence of Alleged Physical Impairments

The record contains some reports from before the alleged onset date of October 1, 2015. On March 25, 2015, plaintiff called the Veterans' Affairs Medical Center ("VA") complaining of lower back pain radiating to the legs, rated at eight out of ten in pain. AR at 707. Plaintiff sought a new medication. *Id.* On March 30, 2015, plaintiff went to the VA with back pain rated a seven out of ten. *Id.* at 705. Plaintiff had a positive right straight leg raise and was prescribed Percocet because Tylenol 3 upset his stomach. *Id.* at 702. On September 2, 2015, plaintiff requested an appointment with the VA to help with balance issues. *Id.* 598. He was seen on September 25, 2015, by Dr. Nieto for a cough and complained that he had left foot pain and swelling for one day, but it had resolved. *Id.* at 593. The doctor ordered testing of his uric acid and prescribed naproxen as needed. *Id.* at 595.

The first entry in the record following the onset date is a call to the VA on October 22, 2015 with a complaint of back spasms. *Id.* at 591. Plaintiff requested narcotic pain medication; he was offered Mobic and Flexeril as an alternative, but he declined. *Id.* at 592.

On November 12, 2015, plaintiff reported to the emergency room for gout pain in his right great toe that was worse with ambulation. *Id.* at 319. He was given Percocet for his pain. *Id.* The

next day, plaintiff followed up with the VA and requested pain medication, stating he was low on his gout medication. *Id.* at 583. It is noted that plaintiff was not taking his gout medication as recommended. *Id.* at 586. X-rays from that day indicate moderate pes planus. *Id.* at 1276.

On November 16, 2015, plaintiff called the VA again, saying his foot pain was severe and requested narcotics. *Id.* at 583. When Dr. Jennifer Baptiste explained her inability to provide narcotic medication for his foot pain, plaintiff stated he would like to change doctors. *Id.* On November 18, 2015, plaintiff called cancelling his podiatry consultation because his foot pain had subsided. *Id.* at 464.

A letter from Dr. Nieto on December 10, 2015, said that recent x-rays showed mild to moderate degenerative changes in the lumbar spine at L5-S1. *Id.* at 580. A letter dated December 17, 2015, indicated that an x-ray showed "no fracture or dislocation, [and] moderate pes planus (flat foot)." *Id.* at 579.

On March 8, 2016, plaintiff saw Dr. Baptiste at the VA, reporting back pain from lifting a couch. *Id.* at 567. He reported intermittent back pain that radiated to the legs when he walked for exercise and mild daily pain "he could live with." *Id.* Examination revealed tenderness of the lower right lumbar spine and paraspinal muscles, intact strength, and normal gait. *Id* at 569. He had occasional radiating pain, but it was not serious enough to take medication daily. *Id.* at 571. Plaintiff had stopped taking his blood pressure medication. *Id.* at 567. He was prescribed ten Percocet. *Id.* at 571. He was referred to physical therapy and recommended a TENS unit. *Id*. On March 13, 2016, Dr. Baptiste followed up, telling plaintiff that his blood tests revealed he had polycythemia ("high red blood cell count"), likely due to cigarette smoking. *Id.* at 564-65. This was confirmed in bloodwork on April 20, 2016 (*Id.* at 554), and May 10, 2016, at a visit with hematologist Dr. Faysal Haroun (*Id.* at 548). Dr. Haroun noted that plaintiff's voice had changed

but plaintiff denied constitutional symptoms. *Id.* at 459. He reported smoking for twenty to thirty years and currently smoking half a pack to a pack of cigarettes a day. *Id.* at 460. He was observed as having a normal gait, no cyanosis or edema, and reporting pain at a zero out of ten. *Id.*

On June 1, 2016, plaintiff called Dr. Baptiste to report a gout flare up, with pain ten out of ten, stating that the colchicine for his gout did not work and seeking different medication. *Id.* at 546. He noted that the pain began after eating a "lot of red meat." *Id.* He agreed to try ibuprofen. *Id.* Two days later, plaintiff called the office again, saying that his symptoms initially subsided, but after drinking two lemon drops, his gout had flared again. *Id.* at 544. He said he had not had a gout flare for six months. *Id.* at 543-44. Plaintiff said he had run out of his gout medication but refused to go to the clinic or emergency room for evaluation. *Id.* at 544. Dr. Baptiste sent in a prescription overnight. *Id.* Plaintiff then went to the emergency room. *Id.* at 334. It was reported that he had five days of worsening right great toe pain, worse with movement and touch. *Id.* He was given Percocet, prednisone, and ibuprofen. *Id.*

On June 9, 2016, plaintiff followed up with Dr. Baptiste's office for right foot pain and back pain. *Id.* at 538. He reported that his back recently went out when he bent over. *Id.* at 532. He reported his pain level as ten out of ten, had mild swelling at the base of the great toe, and gait favoring his right foot, but had full range of motion, no warmth or redness, had no acute distress and was ambulatory. *Id.* at 535, 538. Plaintiff reported that he had not been taking the prednisone he received at the ER due to concern of side effects. *Id.* at 532. He was instructed to continue his gout medications and was again referred to physical therapy for his back. *Id.* at 536. Plaintiff refused the recommended x-rays. *Id*. Plaintiff requested Percocet and promised he would never ask for it again. *Id*. He was mailed a back brace by the VA on June 29, 2016, and a TENS unit on July 12, 2016. *Id.* at 450-51.

On June 23, 2016, plaintiff called the VA clinic to discuss pain management, citing ten out of ten back pain and lack of relief from ibuprofen. *Id.* at 527. He was advised to go to the emergency room, which he declined and insisted on speaking with Dr. Baptiste. *Id.* at 528. He was offered the next telephone appointment to speak with Dr. Baptiste, or to speak to a different doctor, but he declined both. *Id.*

On July 12, 2016, plaintiff attended physical therapy. *Id.* at 524. It was observed that he had a slightly antalgic gait due to back pain that was reported as seven out of ten. *Id.* Straight leg raising revealed tight bilateral hamstrings. *Id*. Slump testing was positive for the left L5 region. *Id.* His functional limitations were listed as sleeping, walking, and sitting. *Id.* at 525. He had good posture, 15% flexion range of motion and 85% extension range of motion. *Id.* at 523. He had full trunk strength, and reduced hip strength. *Id.* at 524. He was noted to have good rehabilitation potential. *Id.* He also stated that he worked full time on this date. *Id.* at 523.

On July 15, 2016, plaintiff reported to the VA complaining of nausea and a right toe gout flare. *Id.* at 520. He noted he had not taken his gout medication because it made him drowsy. *Id.* His right big toe was slightly warm to the touch, but it was not swollen and he was ambulatory. *Id.* at 521. He would only speak to Dr. Baptiste and made a phone appointment for July 20. *Id.* He was instructed to take his gout medication until then. *Id.* During that phone appointment, plaintiff raised concerns about his polycythemia and Dr. Baptiste advised him to quit smoking. *Id.* at 1440. Plaintiff indicated he smoked five cigarettes a day and had intermittent headaches. *Id.* There is no mention of his gout.

On August 22, 2016, plaintiff visited the VA to discuss his headaches. *Id.* at 1427. He stated that he was told by a neurologist in June 2015 to take medication daily, but he did not want to do so. *Id.* at 1427-28. He reported occasional dizziness and headaches that lasted a few hours in

the morning. *Id.* at 1428. He smoked a quarter of a pack of cigarettes daily. *Id.* He had full strength, normal gait, no edema, and a negative Romberg test. *Id.* at 1430. He requested Fiorinol with Codeine, which the doctor explained was not medically appropriate for daily headaches due to risks of overuse. *Id.* at 1432.

On September 12, 2016, plaintiff reported to the emergency room for an abscess on his right medial buttock. *Id.* at 1199. He requested Percocet and reported ten out of ten pain. *Id.* The examination notes he was in no distress, had a normal range of motion, and had no infection. *Id.* at 1201. Plaintiff declined an ultrasound for diagnosis and demanded Percocet. *Id.* at 1203. The notes indicate the doctor could not find signs or symptoms of cellulitis or abscess without an ultrasound. *Id.* The doctor, noting narcotics were not indicated, offered a prescription for Naprosyn. *Id.*

On October 17, 2016, plaintiff reported to Dr. Baptiste with flu-like symptoms and four days of weakness in the right hand. *Id.* at 1402. Plaintiff had no dizziness, five out of five strength in all extremities, a steady gait, and a normal neurological exam. *Id.* at 1403, 04-05. He was diagnosed as having viral gastroenteritis and an upper respiratory infection and it was noted that he might have developing degenerative joint disease. *Id.* at 1406.

On October 22, 2016, plaintiff participated in a sleep study (nocturnal polysomnography) for his snoring, tiredness, and headaches. *Id.* at 2191. The study revealed mild obstructive sleep apnea syndrome with mild oxygen desaturation. *Id.* at 2192. It was recommended that he maintain his ideal body weight, follow up with an ENT, and do a CPAP titration study. *Id.*

On October 26, 2016, plaintiff called Dr. Baptiste seeking a handicap parking tag. *Id.* at 1397. Plaintiff reported walking a mile daily for exercise. *Id.* Dr. Baptiste relayed that if he could walk a mile, he did not meet the criteria set by the DMV. *Id.*

On November 15, 2016, plaintiff saw a hematologist for right calf pain. *Id.* at 1392. He reported pain improved with rest and his dizziness and headaches improved in the past month with his statin medication. *Id.* at 1392. He was noted to have no cyanosis or edema and a normal gait. *Id.* at 1394. He was encouraged to get a CPAP machine and advised that sleep apnea and smoking are causes of polycythemia. *Id.* at 1395.

The next time plaintiff sought treatment for back pain was February 14, 2017, when plaintiff reported to the emergency room following a car accident. *Id.* at 1223. He was positive for lumbar paraspinal tenderness only. *Id.* at 1225. It was noted that he had neck strain and low back strain, although his neck range of motion was normal, as was his musculoskeletal range of motion. *Id.* at 1225-26. Plaintiff was given a short course of Vicodin. *Id.* at 1226.

He returned to the emergency room a week later, on February 20, 2017, for generalized neck and back pain. *Id.* at 1237. He was observed to have bilateral paraspinal tenderness and thoracic and bony tenderness. *Id.* at 1239. He had normal lumbar range of motion, no spasms or swelling, and no deformity of the cervical back, thoracic back, or lumbar back. *Id.* He had full strength and sensation. *Id.* His thoracic spine x-ray showed normal vertebral alignment, with normal height and configuration, maintained disc spaces, normal pedicles and spinous process, and no fracture. *Id.* at 1240. His cervical spine x-ray showed narrowing of the C5-6 and C6-7 intervertebral disc spaces with endplates and uncovertebral joint hypertrophy resulting in neural foramina stenosis. *Id.* There was no evidence of fracture or dislocation and maintained prevertebral soft tissues and airways. *Id.* His lumbar spine x-ray showed normal vertebral body alignment and lumbar lordosis, maintained intervertebral spaces, no acute fracture, and unremarkable sacroiliac joints. *Id.* at 1240-41. Plaintiff requested Percocet and was given a small prescription with ibuprofen. *Id.* at 1241.

10

On February 23, 2017, plaintiff saw Dr. Kapil Gopal at INOVA Vascular and Vein Center. *Id.* at 2157. He complained of claudication in the right leg, right shoulder discomfort, and right hand weakness. *Id.* Plaintiff had no palpable pedal pulse in the right foot. *Id.* at 2159. Dr. Gopal found peripheral arterial disease in the lower extremities. *Id.* at 2160.

On March 6, 2017, plaintiff reported to the VA clinic complaining of a boil on his right buttock and was prescribed Percocet and Bactrim. *Id.* at 1369, 1373. He was described as ambulatory and in no distress. *Id.* at 1374.

An ultrasound on March 20, 2017 found thoracic outlet compression in the left arm, although plaintiff came in for weakness in the right upper extremity. *Id.* at 2117. Three days later, plaintiff returned to the INOVA Vascular and Vein Center. *Id.* at 2107. He reported claudication after walking 15-20 minutes but stated he was able to walk greater than a mile without a break. *Id.* Carotid duplex imaging revealed bilateral carotid internal artery with 1-49% stenosis with antegrade blood flow in both vertebral arteries. *Id.* at 2110. Plaintiff had full range of motion and intact gross motor and sensory examinations. *Id*. Plaintiff was diagnosed as having peripheral arterial disease on the right, but with only non-disabling claudication and no other symptoms. *Id*. He was prescribed Pletal and was encouraged to quit smoking, but no other intervention was required. *Id.* at 2111.

On April 18, 2017, plaintiff called the VA and stated that he was not taking Pletal because he could not afford it and wanted to see if he could get it from the VA clinic. *Id.* at 1367. On April 25, 2017, plaintiff reported to Dr. Baptiste with shoulder pain in both shoulders radiating to the arms. *Id.* at 1364. Plaintiff requested physical therapy, but would not share his diagnosis from his outside physician. *Id.* at 1365. Dr. Baptiste noted no deformity, full strength in his arms, and some pain with rotation, and noted that he may have cervical radiculopathy and referred him for an MRI.

11

*Id.* at 1360-1361. Plaintiff also stated that he had still not filled his Pletal prescription and was still smoking four cigarettes per day. *Id.* at 1358. He requested narcotic medication, which the doctor denied and explained did not provide long term relief. *Id.* at 1361. He was not interested in any non-narcotic options. *Id.*

On April 27, 2017, plaintiff went to the emergency room for gout pain in his left great toe. *Id.* at 1253. He reported that he had not taken his colchicine for some time and did not take his colchicine or indomethacin because they were not narcotic. *Id.* at 1253, 56. He reported being depressed because he had run out of Percocet. *Id.* at 1256. He refused to leave the hospital without Percocet and was given a single pill. *Id.*

The next day, he followed up with Dr. Baptiste, who noted warmth and swelling in the left toe. *Id.* at 1344. He reported he was taking his gout medication as prescribed and noted that his TENS unit and heating pad worked to alleviate his pain. *Id.* He insisted Percocet was the only thing that helped his pain. *Id.* at 1344. Plaintiff declined the doctor's recommendation to try various non-narcotic medications that treat lumbar radiculopathy and declined her referral to the pain clinic or integrative health and wellness clinic because he did not want to go to D.C. *Id.* at 1348. The doctor prescribed ten Percocet. *Id.* It was noted by the doctor that his polycythemia was resolved. *Id.*

On May 23, 2017, plaintiff called Dr. Baptiste's office to report his polycythemia was getting worse and sought referral to hematology. *Id.* at 1337. On May 31, 2017, Dr. Baptiste referred plaintiff to physical therapy for cervicalgia and right shoulder pain with tendinitis. *Id.* at 1456. On the same day, plaintiff's MRI showed degenerative disc disease of the cervical spine with osteophytes and disc bulge and right shoulder tendinitis with AC joint arthropathy. *Id.* at 1512. It was recommended that plaintiff try topical treatment and gabapentin for pain relief. *Id.*

On June 15, 2021, plaintiff reported to the VA complaining of a boil on his buttock and

reporting ten out of ten pain. *Id.* at 1501, 1507. He requested Percocet or Tylenol 3, although he was reported as in no distress, sitting comfortably in his chair and had no abscess or drainage. *Id.* at 1503. Plaintiff requested narcotics, but was prescribed Bactrim and advised to see a dermatologist, but declined a referral. *Id.* at 1505.

On July 10, 2017, Plaintiff saw Dr. Baptiste and reported ten out of ten pain, but that physical therapy was helping. *Id.* at 1493, 99. He saw a hematologist who told him his blood cell count looked good. *Id.* He also reported feeling dizzy all day, but denied losing his balance and stated he was seeing an ENT. *Id.* at 1494. He was ambulatory, had a normal neurological examination, a negative Romberg test, a normal vertigo examination, and full strength. *Id.* at 1496. He requested narcotic medication, which was denied. *Id.* at 1497.

On August 15, 2017, plaintiff had a phone consultation with the VA where he reported being diagnosed with plantar fasciitis and having been given Vicodin. *Id.* at 1489. He requested more Vicodin, but the doctor told him it was not indicated and recommended a splint, stretching, and cold therapy. *Id.*

On September 26, 2017, plaintiff spoke with his physician to discuss his August 14, 2017 head CT. *Id.* at 1483. The CT revealed nonspecific white matter changes, representing likely sequela of chronic small vessel ischemic disease along with parenchymal volume loss, as well as evidence of a remote lacunar infarct in the left thalamus. *Id*. There was no evidence of acute hemorrhage or ischemia. *Id*. It was noted that plaintiff's polycythemia had resolved with smoking cessation. *Id.* at 1484.

On February 12, 2018, Dr. Baptiste, by letter, noted that plaintiff should follow up concerning his polycythemia, as his blood count was elevated. *Id.* at 2190. In a follow up on February 27, 2018, Sharon Coot-Johnson, PA-C, noted plaintiff's history of elevated hemoglobin,

but noted he was currently asymptomatic for polycythemia following his switch to vaping and had normal gait and no cyanosis or edema. *Id.* at 1460.

On May 17, 2018, plaintiff reported to the emergency room with pain on the surface of his foot and "popping" when he walked. *Id.* at 1520. Right mid fifth metatarsal tenderness was noted and an x-ray revealed cortical bony protrusion, although plaintiff had normal gait, no weakness, no edema, and a normal range of motion. *Id.* at 1522-23. Plaintiff sought Percocet. *Id.* at 1524. He left with a prescription for Naprosyn, but called the emergency room at 2:15 a.m. claiming the pharmacy did not have the medication and demanded a prescription for Percocet or "some strong narcotic." *Id*. The notes indicate the doctor was "very concerned about drug-seeking behavior." *Id.* The next day plaintiff returned to the emergency room seeking opiates and was denied again. *Id.* at 1566. He noted that the pain felt different than gout. *Id.* He was advised to follow up with a podiatrist, wear a post-operative shoe, and use crutches. *Id.*

The next week, on May 24, 2018, plaintiff returned to the emergency room with right hand weakness and right-sided neck pain. *Id.* at 1608. He had no arm pain or speech difficulties. *Id.* at 1610. He had normal gait, range of motion, and motor strength. *Id*. A head CT showed bilateral frontal atrophy with small vessel ischemic changes and no acute intracranial hemorrhage, resulting in an impression of no acute intracranial abnormality. *Id.* at 1612-13. Subsequent evaluation described that plaintiff could not extend the fingers of his right hand, but that his grip was normal and he had no other deficits. *Id.* at 1643. There was mild ataxia in the right upper extremity and right finger wrist drop. *Id.* at 1650. The MRI indicated multiple punctate acute infarcts in the high left mid parietal white matter, new punctate acute infarcts in the left corpus callosum, and chronic small vessel ischemic changes in the periventricular and deep cortical white matter. *Id.* at 1652. A cervical spine MRI reviewed mild central canal stenosis at C2-3 and C3-4, a minimal broad-based

14

disc bulge and no neural foraminal narrowing. *Id.* at 1661. It showed severe left neural foraminal narrowing at C5-6, moderate disc narrowing and no significant central canal stenosis. *Id.* There was severe bilateral neural foraminal narrowing at C6-7. *Id.* After receiving his MRIs, plaintiff insisted on discharge against medical advice and before testing was completed. *Id.* at 1653.

Plaintiff returned to the emergency room the next day at 2:21 a.m. *Id.* at 1737. An echocardiogram revealed mild dilation of the proximal aortic root and mild tricuspid regurgitation. *Id.* at 1803. He had no headache, vision changes, numbness, left arm weakness, leg weakness, nausea, vomiting or back pain. *Id.* at 1738. He had some weakness in his right hand, but had five out of five strength in his lower extremities and normal sensation. *Id.* at 1740. On May 26, 2018, he had regained extension of his fingers and had no other symptoms. *Id.* at 1779. He was discharged with a prescription for Plavix. *Id.* at 1750. On May 29, 2017, he followed up at the VA and was observed to have five out of five upper extremity strength, no edema, and zero out of ten pain. *Id.* at 2051, 2054.

On June 26, 2018, plaintiff saw Dr. Baptiste for foot pain. *Id.* at 2036. He reported he had stopped taking Plavix because he believed it to be worsening his gout. *Id.* Plaintiff was observed to have left great toe swelling and redness. *Id.* He was prescribed Aggrenox on that date. *Id.* at 2040. He was given Percocet for his gout. *Id.* at 2041. On July 16, 2018, he asked to switch back to Plavix, as he believed Aggrenox caused dizziness. *Id.* at 2026.

On July 19, 2018, plaintiff reported to the emergency room complaining of feeling numb in the right rib area, but left before being seen. *Id.* at 1995. On July 20, 2018, plaintiff saw Dr. Baptiste for neck pain that was worse with rotation. *Id.* at 2017. Plaintiff had five out of five strength, sensation grossly intact, normal gait, no tenderness of cervical spine or paraspinal muscles, good rotation of the neck, and a normal neurological exam. *Id.* at 2019. The doctor noted

that his symptoms were likely caused by his existing degenerative disc disease or disc bulging. *Id.* at 2021.

### c.   State Opinion Evidence

On July 29, 2016, Dr. Richard Surrusco, at the initial stage of review, noted that plaintiff could perform light work and lift 20 pounds occasionally and 10 pounds frequently. AR at 76. He noted that plaintiff could sit for six hours at a time or stand and walk for six hours at a time. *Id.* Dr. Surrusco said plaintiff should be limited in pushing and pulling with his right lower extremity, and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl. *Id.* He also opined that he should never climb ladders, ropes and scaffolds and should avoid concentrated exposure to wetness and humidity. *Id.* at 77. He ultimately concluded that plaintiff could perform his past relevant work as actually performed and that he was not disabled. *Id.* at 78.

Dr. Lewis Singer, at the reconsideration stage, generally agreed on February 22, 2017, and similarly found that plaintiff could perform his past relevant work and was not disabled. *Id.* at 103. However, Dr. Singer did not include limitations on pushing and pulling and did not limit exposure to wetness or humidity. *Id.* 102. He added a limitation on concentrated exposure to hazards. *Id.*

The ALJ gave the state agency medical consultants' opinions some weight, but concluded that a medium Residual Functional Capacity ("RFC") was more appropriate based on the medical evidence. *Id.* at 29.

### II.   Disability Evaluation Process

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the

claimant must have a severe impairment that makes it impossible to do past relevant work or any other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983).  Determining whether an applicant is eligible for disability benefits under the SSA entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in [the SSA's official Listing of Impairments]; (4) the claimant can perform [his] past relevant work; and (5) the claimant can perform other specified types of work."  *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). Before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC, meaning the most that the claimant can do despite his or her physical or mental limitations. C.F.R. §§ 416.920(h), 416.945(a)(1).

### a.  The ALJ's Decision

On January 25, 2019, the ALJ issued a decision finding plaintiff not disabled from October 1, 2015, through the date of the decision, and denying his application for benefits. AR at 15. Under the first step, the ALJ found that plaintiff did not engage in any SGA from his alleged onset date of October 1, 2015. *Id.* at 21. At step two, the ALJ found that plaintiff had the following severe impairments: gout, cervical degenerative disc disease, lumbar degenerative disc disease, right shoulder arthropathy and tendinitis, polycythemia, peripheral arterial disease, and thoracic outlet syndrome. *Id.* The ALJ further found plaintiff's other medical conditions, alone or in combination, to be non-severe impairments. *Id.* As the medical record indicated no memory problems, the ALJ found that plaintiff's stated memory problems caused no more than minimal limitation in the ability to work. *Id.* Under step three, the ALJ found that plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the impairments listed in the SSA's official Listing of Impairments. *Id.*at *22*.

Before proceeding to steps four and five, the ALJ determined plaintiff's RFC. In doing so, the ALJ considered all reported symptoms and the extent to which those were reasonably consistent with objective medical evidence and opinion evidence. *Id.* at 23. The ALJ applied a two-step process, considering first whether the underlying impairment would be reasonably expected to produce plaintiff's pain, and second whether the impairments limit plaintiff's functioning. *Id.* at 24. The ALJ determined that, while the impairments could be reasonably expected to cause plaintiff's symptoms, the plaintiff's statements about the intensity and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." *Id.*  She then walked through each of plaintiff's symptoms and the medical evidence in the record as related to each.

First, while plaintiff reported back, neck and shoulder pain that would prevent medium work, the record does not reflect the same. While plaintiff reported extreme pain throughout the record, plaintiff's doctors frequently observed full strength, mobility and lack of distress. *See e.g. Id.* at 460, 1201, 1374, 1394, 1403, 1404-05, 1430, 1503, 2051, 2054.

Second, the ALJ found that plaintiff's gout would not limit him from performing medium work. The ALJ walked through the numerous times plaintiff sought treatment for gout pain in his foot and sought narcotic medication. *Id.* at 26. Providers note he had not been following his non-narcotic medication regimen to treat the gout. *Id.*

Third, in regard to his dizziness from polycythemia, the ALJ recounted his history of smoking and multiple indications from physicians that cigarette smoking was the cause. *Id.* at 27. In fall 2016, plaintiff sought options for smoking cessation and was "asymptomatic with regard to

18

his polycythemia." *Id.* In July 2017, plaintiff's bloodwork was normal, while his red blood cells were elevated in February 2018. *Id.* The ALJ notes that plaintiff reported no current dizziness and that he drove daily. *Id.* at 28. The ALJ found these symptoms to be consistent with medium work, with no commercial driving and exposure to hazards.

Fourth, the plaintiff's peripheral artery disease, similarly, was not found to be inconsistent with medium work. After seeking treatment, Dr. Kapil Gopal found his symptoms "nondisabling" and recommended Pletal for treatment, which plaintiff said he could not afford and did not have filled. *Id.* (citing *id.* at 2111). Plaintiff also reported, in March 2017 and again in May 2018, that he could walk a mile or more. *Id.* The RFC of medium work limited to no climbing of ladders, ropes or scaffolds, no operation of foot controls and no exposure to hazards was found to account sufficiently for any limitations. *Id.*

In regard to state medical opinion evidence, the ALJ notes that Dr. Richard Surrusco at the initial stage and Dr. Singer at reconsideration limited plaintiff to light work, however she concluded that based on the record as a whole and plaintiff's lack of compliance with recommended courses of treatment, a medium capacity with occasional postural activities, no climbing of ladders, ropes and scaffolds, and no operation of foot controls, and no exposure to hazards was more appropriate. *Id.* at 29. Further, the state experts found plaintiff able to do his past work, which was of a medium RFC. *Id.* at 78, 103.

Under step four, the ALJ found that, per the testimony of the VE, plaintiff was capable of performing his past relevant work as a psychiatric aide. *Id.* Plaintiff's past relevant work was medium, both generally and as performed. *Id.* While plaintiff drove for the prior jobs, this was not a requirement as defined in the *Dictionary of Occupational Tiles*, and thus he would be able to perform the job as generally performed. *Id.* Based on the foregoing analysis, the ALJ concluded

that plaintiff was not disabled as defined by the Act. *Id.*

### b. Appeals Council Review

On December 6, 2019, the Appeals Council denied plaintiff's request for review, finding no basis for review and declaring the ALJ's decision to be the final decision of the Commissioner of Social Security. AR at 3.

### III. Standard of Review

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589. When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).  If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson*, 402 U.S. at 401.

Although the standard is high, when the ALJ's determination is not supported by

substantial evidence on the record or when the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents a remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curium)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016). When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would have been different." *Morton-Thompson v. Colvin*, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411-12 (2009)).

### IV.   Analysis

Plaintiff makes one claim: that the ALJ erred in assessing the state medical opinion evidence and relied instead on her own lay interpretation of the record. Pl. Br. (Dkt. No. 16) at 11. Specifically, plaintiff contends that the ALJ did not properly consider the opinions of Dr. Surrusco and Dr. Singer, which indicate an RFC of light work. *Id.* 11-12. For the reasons that follow, the undersigned recommends denying plaintiff's Motion for Summary Judgment, granting defendant's Motion for Summary Judgment, and affirming the ALJ's decision.

The Fourth Circuit has held that an ALJ is not required to base an RFC assessment on a specific medical opinion, but instead on the record as a whole, including subjective complaints,

objective medical evidence, and medical source opinion. *See Felton-Miller v. Astrue*, 459 Fed. App'x 226, 230-31 (4th Cir. 2011). Moreover, this circuit has recognized that an ALJ is entitled to rely on the opinion of a reviewing physician or psychologist when it is consistent with the other evidence in the record. *See, e.g.*, *Johnson*, 434 F.3d at 656-57 (finding that substantial evidence "supports the ALJ's reliance on Dr. Starr's opinion" because his opinion was consistent with other doctors' opinions). It is the ALJ's exclusive duty, as a fact finder, to make an RFC assessment. *Astrue*, 459 Fed. App'x at 230-31; *see also* 20 C.F.R. § 404.1546(c).

This Court, in reviewing, may not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589; *see also King*, 599 F.2d at 599 (providing that it is not the role of the court to try the case de novo when reviewing disability determinations). The "ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies, or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015).

The ALJ, in her determination, gave the state experts' opinions "some" weight. AR at 28-29. The combined opinions of the state's medical experts indicated that plaintiff should be limited in pushing and pulling with his right lower extremity, could occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl, should never climb ladders, ropes and scaffolds, should avoid concentrated exposure to wetness and humidity, and limit concentrated exposure to hazards. *Id*. at 68-104. Both experts also found plaintiff to be non-disabled and able to perform his past work as actually performed, which was a medium RFC. *Id.* The ALJ agreed that plaintiff's gout, polycythemia, and peripheral arterial disease make these limitations necessary and included them in her assessment.

However, the ALJ did not find limitations beyond those recommended by the state medical experts to be necessary. With respect to plaintiff's gout, she noted that lack of compliance with gout medication and drug-seeking behavior did not support a need for additional limitations. *Id.* at 27. While plaintiff asserts to have quit his previous employment due to dizziness caused by polycythemia, the record indicates that he only sought treatment after he had quit his previous job. *Id.* At multiple times throughout the record, plaintiff indicates that he had no symptoms from the polycythemia and on several occasions his primary physician indicates that the polycythemia has been resolved. Additionally, plaintiff reports driving daily. Because of this, the ALJ did not find limitations beyond limiting exposure to hazards necessary. *Id.* at 28. Further, plaintiff's ability to walk a mile, normal extremity strength throughout the record, and lack of compliance with his medication indicate that a greater limitation, beyond the limitation from climbing ladders, ropes, scaffolds, exposure to hazards, and operation of foot controls, is not necessary to account for plaintiff's peripheral arterial disease.

Considering the record as a whole, the ALJ found medium work to be more consistent with the medical evidence in the record. *Id.* at 26, 27, 28. Her ruling stated that plaintiff maintained the RFC to "perform medium work as defined in CFR 404.1567(c) and 416.967(c) except that he cannot operate foot controls. The claimant can frequently crouch, crawl, stoop, and kneel. He should have no exposure to hazards, including unprotected heights and hazardous machinery, and should not engage in commercial driving." *Id.* at 23. The ALJ clearly considered the opinion evidence, agreeing with the doctors' assessments of plaintiff's limitations, but finding them consistent with medium work. The state medical experts themselves agreed that, even with the limitations they recommended, plaintiff could perform his past work, which the VE categorized as medium as actually performed. *Id.* at 78, 103. Given a hypothetical person "limited to medium

work that had no exposure to hazards, no unprotected heights, hazardous machinery, no commercial driving, no ladders, ropes, crawling, stooping, [or] kneeling," the VE found at the hearing before the ALJ that such a person could perform plaintiff's past work or other medium work available in the national economy. *Id.* at 63-64.

The ALJ alone has the discretion to weigh the evidence in the record to make a determination as to the plaintiff's RFC, and this Court cannot reweigh the opinions or evidence. The ALJ properly considered the limitations recommended by the state medical experts and in fact included their recommendations in her RFC determination. The ALJ's finding of a medium RFC is consistent with the medical evidence, and her disagreement with the state medical expert's RFC determination is not based on specious inconsistencies. Therefore, the undersigned finds that the ALJ appropriately weighed the state agency physicians' opinions and appropriately afforded them some weight.

### V.      Recommendation

For the reasons set forth above, the undersigned recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 15) be DENIED, that defendant's Motion for Summary Judgment (Dkt. No. 21) be GRANTED, and that the ruling for the defendant be AFFIRMED.

### VI.     Notice

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to timely file objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

_____ /s/

Michael S. Nachmanoff
United States Magistrate Judge

April 7, 2021
Alexandria, Virginia